# IN THE UNITED STATE DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

LAUREN BERN a/k/a/ LAUREN BRITTON    )
and JOSHUA BRITTON,                              )
                                                             )
                            Plaintiffs,              )
                                                             )          Civil Action No.
            vs.                                            )
                                                             )
HCA-HEALTHONE LLC, d/b/a                 )
SWEDISH MEDICAL CENTER;              )
RADIOLOGY IMAGING ASSOCIATES, P.C. )
d/b/a RIA NEUROVASCULAR a/k/a       )
RIA NEUROVASCULAR SURGICAL        )
SERVICES, LLC; MEDICAL IMAGING OF )
COLORADO LLC; and                             )
RICHARD BELLON, MD,                         )
                                                             )
                                                             )
                            Defendants.             )

---

## COMPLAINT, CERTIFICATE OF REVIEW, AND JURY DEMAND

---

Plaintiffs, Lauren Bern a/k/a Lauren Britton and Joshua Britton, by and through their

counsel, Leventhal Puga Braley P.C., respectfully submit the following Complaint:

### CERTIFICATION PURSUANT TO C.R.S. § 13-20-602(3)

Pursuant to C.R.S. § 13-20-602(3), counsel certifies as follows:

a.      Counsel has consulted with licensed professional(s) with expertise in the areas of

        the alleged negligent conduct as set forth in Plaintiffs' Complaint;

b.      The licensed professional(s) who have been consulted have reviewed the known

        facts relevant to the allegations of negligent conduct as set forth in Plaintiffs'

        Complaint;

1

c.      Upon review of such facts, the licensed professional(s) have concluded that the filing of the claims against the Defendants does not lack substantial justification within the meaning of C.R.S. § 13-17-102(4); and

d.      The licensed professional(s) meet the requirements set forth in C.R.S. § 13-64-401.

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff Lauren Bern a/k/a Lauren Britton is an individual residing and domiciled in the State of Illinois.

2.      Plaintiff Josh Britton is an individual residing and domiciled in the State of Illinois.

3.      At all relevant times, HCA-HealthONE LLC, d/b/a as Swedish Medical Center ("Defendant Swedish"), was and is a Colorado professional corporation with its registered agent in the County of Arapahoe, Colorado and is domiciled in the State of Colorado.

4.      At all relevant times, Radiology Imaging Associates, P.C. ("Defendant RIA"), was and is a Colorado professional corporation with its registered agent located at 10800 E. Geddes Ave., Ste 300, in County of Arapahoe, Colorado and is domiciled in the State of Colorado.

5.      At all relevant times, Medical Imaging of Colorado LLC ("Defendant MIC"), was and is a Colorado professional corporation with its registered agent located at 10800 E. Geddes Ave., Ste 300, in County of Arapahoe, Colorado and is domiciled in the State of Colorado.

6.      Defendant Richard J. Bellon, M.D. ("Defendant Bellon") was, at all relevant times, a physician licensed to practice medicine in the State of Colorado, specializing in vascular and interventional radiology as well as neuroradiology, whose principal place of business is located at 10800 E. Geddes Ave., Ste 300, in County of Arapahoe, Colorado and is domiciled in the State of Colorado.

7.      This Court has jurisdiction over the subject matter of this case pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and there is complete diversity between Plaintiffs and Defendants.

8.      Venue is proper in accordance with 28 U.S.C. § 1391(a) because a substantial part of the relevant events occurred in this judicial district and Defendant resides in this district.

## GENERAL ALLEGATIONS

9.      On February 7, 2021, Plaintiff Lauren Bern was 38 years old and 40 weeks pregnant.

10.     A cause of hypercoagulation is pregnancy.

11.     Hypercoagulation is a condition that causes blood to clot more easily than normal.

12.      Plaintiff Lauren Bern had an expected delivery date of February 8, 2021.

13.     On February 7, 2021, at approximately 11:14 a.m., Plaintiff Lauren Bern presented via ambulance to the Emergency Department at Porter Adventist Hospital.

14.     Plaintiff Lauren Bern was seen in the Emergency Department for complaints of thunderclap headache, which she described as the worst headache of her life.

15.     According to Plaintiff Lauren Bern, the thunderclap headache had been ongoing for approximately 30 minutes with an onset while she was straining on the toilet.

16.     On February 7, 2021, Plaintiff Lauren Bern was also experiencing intractable nausea accompanied by vomiting.

17.     On February 7, 2021, Dr. Kevin Merrell assessed Plaintiff Lauren Bern and found her to be neurologically intact, but in obvious distress.

18.     Subsequent CT imaging, on February 7, 2021, revealed Plaintiff Lauren Bern to have a subarachnoid hemorrhage caused by an aneurysm.

19.     An aneurysm occurs when a blood vessel in the brain balloons or bulges outward.

20.     When an aneurysm ruptures, causing blood to leak or fill the surrounding area, it is known as a hemorrhagic stroke or subarachnoid hemorrhage.

21.     Specifically, Dr. Vernon Chapman's impression of the CT images was "acute subarachnoid hemorrhage that is likely from a basilar cisterns or posterior fossa source. CTA is recommended for further evaluation."

22.     Dr. Chapman's impression of the subsequent CTA was "abnormal focus of enhancement along the left aspect of the mid basilar artery that is most consistent with the source of subarachnoid hemorrhage. This may represent a small aneurysm of the basilar artery or an aneurysm of a branch vessel."

23.     On February 7, 2021, Dr. Merrell determined that the fetal heartrate was 98.

24.     A baseline fetal heart range at 40 weeks of pregnancy is approximately 110-160 beats per minute.

25.     On February 7, 2021, Dr. Merrell consulted OB/GYN, interventional neurology and critical care at Swedish Medical Center.

26.     As a result of those consults, Plaintiff Lauren Bern was transferred emergently to the intensive care unit ("ICU") at Swedish Medical Center.

27.     At the same time, it was decided that Plaintiff Lauren Bern would undergo an emergent C-section upon arrival at Swedish Medical Center.

28.     On February 7, 2021, Dr. Julie Gelman, an obstetrics and gynecology specialist, accepted the transfer of Plaintiff Lauren Bern to Swedish Medical Center.

29.    On February 7, 2021, at approximately 1:08 p.m., Plaintiff Lauren Bern underwent a cerebral arteriogram (a.k.a. angiogram) performed by interventional radiologist Dr. Richard Bellon.

30.    Dr. Bellon reported in part "[s]light displacement of the anterior cerebral artery complex is seen consistent with mild to moderate hydrocephalus."

31.    Hydrocephalus is the buildup of fluid deep within the brain.

32.    The buildup of fluid can lead to increased intracranial pressure.

33.    Increased intracranial pressure can cause brain damage.

34.    Additionally, Dr. Bellon concluded "No evidence of aneurysm, AVM or vasculitis. Specifically, the aneurysm near the basilar trunk seen on the outside CT angiogram is not seen on the arteriogram and has presumably thrombosed in the interval."

35.    Dr. Bellon's post-procedure diagnosis included "[t]hrombosed basilar trunk aneurysm."

36.    On February 7, 2021, at approximately 3:08 p.m., Dr. Gelman performed a low transverse cesarean section on Plaintiff Lauren Bern for safety reasons due to the subarachnoid hemorrhage from a basilar arterial aneurysm that was bleeding and had thrombosed.

37.    At approximately 7:49 p.m. on February 7, 2021, Plaintiff Lauren Bern underwent a CT (computed tomography) of her head which was read by Dr. David Dungan.

38.    Dr. Dungan's impression(s) included "[m]oderate severe hydrocephalous had increased from previous exam, leading to increased compression of the sulci and basal cisterns."

39.    Dr. Dungan's impression(s) also included "[o]therwise stable diffuse subarachnoid hemorrhage."

40.    Upon information and belief, Plaintiff Lauren Bern was difficult to arouse after the CT of her head was completed.

41.    Upon information and belief, as a result of Plaintiff Lauren Bern being difficult to rouse, not being able to follow commands, making incomprehensible sounds and not moving all of her extremities, it was determined that an external ventricular drain would be placed.

42.    On February 7, 2021, Dr. Eric Arias placed a right external ventricular drain.

43.    On February 8, 2021, Plaintiff Lauren Bern remained mildly confused and required the use of precedex.

44.    On February 8, 2021, Dr. Kahkeshani reported Plaintiff Lauren Bern to be awake and oriented and able to follow commands including moving all extremities.

45.    Dr. Kahkeshani's notes during his February 8, 2021, reflect "Heme: no sq heparin for now."

46.    On February 9, 2021, Plaintiff Lauren Bern was taken off the precedex and her confusion began to improve.

47.    The below photograph shows Plaintiff Lauren Bern holding her newborn child at Swedish Medical Center on February 10, 2021.



48.      On February 11, 2021, up until her stenting procedure on February 12, 2021, Plaintiff Lauren Bern remained stable, alert and oriented, but continued to have intermittent headaches and diplopia.

49.      On February 12, 2021, prior to the procedure by Dr. Bellon, PA Wojciechowski noted that Plaintiff Lauren Bern was "alert, awake, conversational" with normal mental status, normal motor function and her speech was "clear, fluent."

50.      On February 12, 2021, prior to the procedure by Dr. Bellon, anesthesiologist Max Barron, M.D. noted that Plaintiff Lauren Bern was oriented times three, had no weakness but did have a visual deficit.

51.      On February 12, 2021, at approximately 7:56 a.m., Dr. Bellon performed a Cerebral Arteriogram with Endovascular Stent/Coil Reconstruction of Intracranial Aneurysm on Plaintiff Lauren Bern.

52.      An endovascular coiling procedure is a procedure to treat a ruptured brain aneurysm by inserting a catheter into an artery and threading it up to the aneurysm.

53.    After reaching the aneurysm, the physician will use a stent and/or coils to neutralize the aneurysm from inside the blood vessel itself.

54.    Coiling is the use of very thin wire which is inserted into the aneurysm and coils up filling the aneurysm preventing blood from entering the aneurysm.

55.    A stent is a small mesh like tube which expands to conform to the blood vessel and simultaneously improves blood flow through the vessel and act as a barrier preventing the coils from escaping the aneurysm.

56.    When a metallic object, such as a stent, is placed into a blood vessel, it will cause blood clotting.

57.    Administering Dual Antiplatelet Therapy (DAPT) stops platelets from sticking or clumping together and forming blood clots.

58.    DAPT is the combination of 2 antiplatelet medicines, typically aspirin along with a P2Y12 inhibitor.

59.    For the February 12, 2021 procedure, Dr. Bellon noted that Plaintiff Lauren Bern's initial CT angiogram (from Porter Hospital) showed "pseudoaneurysm near the basilar trunk; initial angiography at this institution negative. For repeat angiography today."

60.    Dr. Bellon noted an approximately 1.5 mm aneurysm projecting posteriorly into the left of the basilar trunk.

61.    During the February 12, 2021 procedure, Dr. Bellon was unable to insert a surgical catheter into the aneurysm.

62.    Using a SL 10 microcatheter, Dr. Bellon attempted to catheterize the small perforating vessel giving rise to the aneurysm.

63.    Dr. Bellon could get a wire into the aneurysm but was unable to penetrate the orifice of the aneurysm.

64.    Due to his inability to penetrate the orifice of the aneurysm, Dr. Bellon switched to a duo 167 microcatheter.

65.    Utilizing the duo 167 microcatheter, Dr. Bellon was still unable to cannulate the aneurysm.

66.    Despite attempting multiple different wire combinations, Dr. Bellon was unable to achieve stable purchase within the aneurysm.

67.    Dr. Bellon backed out and terminated his initial attempts to coil Ms. Bern's aneurysm.

68.    On February 12, 2021, Dr. Bellon then elected to approach the aneurysm from the anterior circulation.

69.    The new approach required Dr. Bellon to go through the posterior communicating artery and down the basilar artery in order to access the aneurysm.

70.    Dr. Bellon believed this new approach would provide a more favorable angle for catheterization of the aneurysm.

71.    With his changed approach attempting to coil the aneurysm, Dr. Bellon was still unable to properly cannulize the aneurysm.

72.    Instead, Dr. Bellon perched a microcatheter at the origin of the aneurysm and proceeded to place a 1x1 wave of coil into the aneurysm.

73.    Arteriography revealed the "bulk" of the coil to be within the aneurysm and a small loop possibly residing with the basilar trunk.

74.    Dr. Bellon did not detach the coil residing in the basilar trunk.

9

75.    Dr. Bellon elected to then utilize a stent (a Neuroform atlas 4x21) to secure the coil in place.

76.    The Neuroform atlas stenting system specifically indicates that it is intended for use in intracranial aneurysms arising from a parent vessel with a diameter of at least 2.0 mm and no greater than 4.5 mm.

77.    The Neuroform atlas stenting system specifically indicates the following contraindications, including, but not limited to:

      a.    Patients in whom antiplatelet and/or anticoagulation therapy (e.g. aspirin and clopidogrel) is contraindicated.

      b.    Patients who have not received antiplatelet agents prior to stent implantation.

78.    Upon information and belief, Dr. Bellon did not stop the procedure at the time he changed from a coiling procedure to a stenting procedure.

79.    Dr. Bellon did not administer DAPT before electing to proceed with the stenting procedure.

80.    Prior to converting to a stenting procedure, Dr. Bellon did not order DAPT for Plaintiff Lauren Bern.

81.    During the placement of the stent, Dr. Bellon did not administer nor order DAPT for Plaintiff Lauren Bern.

82.    After the placement of the stent, Dr. Bellon did not administer nor order DAPT for Plaintiff Lauren Bern.

83.    Dr. Bellon recorded that a total of 4000 units of heparin were given to Plaintiff Lauren Bern during the procedure.

84.    Dr. Bellon did not order dual-antiplatelet treatment at any time during or after the Neuroform atlas stenting procedure.

85.    At no time did any employee, agent, or representative of Defendant Swedish, Defendant RIA, or Defendant MIC, including Jacob Garza or Susann Preuss, request that Dr. Bellon utilize a dual antiplatelet protocol.

86.    It is the obligation of all healthcare providers, regardless of whether the provider is a physician, to make sure that the right medicine and the right dose, at the right time are received by patients under their care.

87.    Dr. Bellon's operative note conclusion included:

a.    Small aneurysm arising from a small perforator off the upper basilar trunk. This was treated with placement of single coil and a basilar Neuroform atlas stent…Good angiographic result without any residual filling of the aneurysm was seen.

b.    There is some mild-moderate basilar vasospasm as well as some left supraclinoid ICA vaspospastic narrowing.

88.    On February 12, 2021, at approximately 3:11 p.m., Dr. Bellon interpreted a CT of Plaintiff Lauren Bern's head to show a stable subarachnoid hemorrhage with improving hydrocephalus.

89.    Dr. Bellon did not administer tPA to Plaintiff Lauren Bern at any point in time during his care and treatment of her.

90.    On February 12, 2021, Dr. Chang examined Mrs. Bern while she was in the procedure room and on the angio table as she was not moving post procedure:

a.    Her teeth clenched which prevented testing her gag reflex;

    b.     Her eyes were not opening;

    c.     She was not following commands;

    d.     She demonstrated abdominal breathing;

    e.     Her upper extremities exhibited extensor posturing; and

    f.     Her lower extremities exhibited upgoing toes.

91.    Dr. Chang performed a repeat exam of Plaintiff Lauren Bern in the Neuro ICU after she was intubated and found:

    a.     Her eyes open and blinking;

    b.     Her head was able to move;

    c.     She was able to follow a command to look up and down and move L fingers;

    d.     PERRL, dysconjugate;

    e.     Has L eom down, dec vertical gaze OD, slight upgaze, no horiz eoms;

    f.     Able to move fingers bilat;

    g.     No movement of BLEs; and

    h.     Her toes were still upgoing.

92.    On February 12, 2021, Dr. Chang assessed Plaintiff Lauren Bern as having an "ICP crisis of 60, given 100 mg of mannitol and ICP back down to 7-10."

93.    On February 12, 2021 at approximately 3:26 p.m., Plaintiff Lauren Bern was also seen by PA Marci Wojciechowski and Dr. Matthew Mian in the ICU after the coiling procedure.

94.    Upon examination, Dr. Mian noted that Plaintiff Lauren Bern had agonal respirations, her pupils measured 2.5mm and were reactive but had a disconjugate gaze and displayed minimal extension of her upper extremities to stimulation.

95.     A stat CT scan was ordered to evaluate for a cause of Plaintiff Lauren Bern's neurologic change.

96.     An MRI was ordered to evaluate for a cause of her neurologic change.

97.     Upon his follow up exam of Plaintiff Lauren Bern on February 13, 2021, Dr. Mian noted her most recent MRI demonstrated a stroke enveloping much of the pons, biased to the left.

98.     A stroke results when the blood supply to part of the brain is interrupted or restricted leading to death of brain cells within minutes.

99.     The pons is part of the brainstem which links the brain and the spinal cord.

100.    The pons is responsible, in part, for regulating many aspects of the body, including breathing.

101.    Additionally, the pons is the point of origin or termination for numerous cranial nerves that transfer sensory information and motor impulses to and from the facial region.

102.    The pons also serves as a pathway for nerve fibers connecting the cerebral cortex with the cerebellum.

103.    Dr. Mian went on to note that there were tiny punctate infarcts in the bilateral cerebellar hemispheres.

104.    On February 14, 2021, Dr. Mian concluded that Plaintiff Lauren Bern was suffering from a pontine infarction secondary to her endovascular intervention resulting in possible locked-in syndrome.

105.    Locked-in syndrome is characterized by complete paralysis of voluntary muscles in all parts of the body except for those that control eye movement with cognitive function intact.

106.    On March 12, 2021, Plaintiff Lauren Bern was discharged from Swedish Medical

Center to inpatient treatment at Shirley Ryan Rehabilitation in Chicago, IL where she remained

until May 7, 2021.

107.    Following her inpatient treatment, Plaintiff Lauren Bern was discharged to the Day

Rehab program in Homewood, IL where she remained until February 2022.

108.    Following her discharge from Day Rehab, Plaintiff Lauren Bern then began

outpatient therapy.

109.    Plaintiff Lauren Bern still has not regained her neurologic function.

110.    Plaintiff Lauren Bern is effectively locked in.

111.    The photograph below shows Plaintiff Lauren Bern and her baby on March 1, 2021:



112.    On and before February 12, 2021, Plaintiff Lauren Bern was a devoted, caring and supportive wife.

113.    As a result of the injuries suffered by Plaintiff Lauren Bern, Plaintiff Joshua Britton has had to provide significant care and support to and for Plaintiff Lauren Bern.

114.    As a result of the injuries suffered by Plaintiff Lauren Bern, Plaintiff Joshua Britton and others had to provide care for their baby daughter as Plaintiff Lauren Bern was not able to care for their baby.

115.    As a result of the injuries suffered by Plaintiff Lauren Bern, Plaintiff Joshua Britton has had to provide significant household services that had been provided by Plaintiff Lauren Bern.

## FIRST CLAIM FOR RELIEF
### (Negligence – Defendant Swedish)

116.    Plaintiffs incorporate by reference all paragraphs of this Complaint as if fully set forth herein.

117.    Defendant Swedish is negligent for failing to have appropriate practices, policies and procedures, as well as training programs, to provide adequate direction to its employees, relating to medication administration and medication requirements for procedures to treat a brain aneurysm.

118.    With respect to the care and treatment of Plaintiff Lauren Bern, and particularly Defendant Swedish breached its duty and was negligent by failing to:

a.    Have in place a medication policy or protocol requiring timely and appropriate anticoagulation therapy be administered to a patient prior to a Cerebral Arteriogram with Endovascular Stent/Coil Reconstruction of Intracranial Aneurysm procedure;

b.    Have in place a medication policy or protocol to ensure that a Cerebral Arteriogram with Endovascular Stent/Coil Reconstruction of Intracranial Aneurysm procedure is not performed before appropriate anticoagulation therapy is administered to a patient;

c.    Properly train its employees/agents to recognize when a patient is hypercoagulable;

d.    Properly train its employees/agents to recognize what constitutes proper antiplatelet therapy;

e.    Properly train its employees/agents to recognize when proper antiplatelet therapy is to be administered;

f.      Properly train its employees/agents to recognize when proper antiplatelet therapy has not been administered; and

g.      Properly train its employees and have a system in place if appropriate antiplatelet therapy has not been administered and to take action to ensure a patient's need for antiplatelet therapy is timely administered.  This includes utilizing the Chain of Command policy.

119.    As a direct and proximate result of the negligence of Defendant Swedish, Plaintiff Lauren Bern has suffered injuries, damages and losses, including, but not limited to permanent disfigurement and functional impairment; increased risk of future complications; past and future medical and rehabilitative care and treatment; 24/7 life care, past and future wage loss; need for assisted care and other economic damages, past and future pain, mental anguish, emotional distress, and psychological complications.

## SECOND CLAIM FOR RELIEF
### (Negligence – Defendant RIA)

120.    Plaintiffs incorporate by reference all paragraphs of this Complaint as if fully set forth herein.

121.    Defendant RIA is negligent for failing to have appropriate practices, policies and procedures, as well as training programs, to provide adequate direction to its employees, in evaluating and treating patients with intracranial aneurysms.

122.    With respect to their care and treatment of Plaintiff Lauren Bern, Defendant RIA breached its duty and was negligent by failing to:

a.      Have in place a policy or protocol requiring appropriate dual antiplatelet/anticoagulation therapy be administered to a patient prior to a cerebral stenting procedure;

b.        Have in place a policy or protocol to ensure that a cerebral stenting procedure is not performed before appropriate dual antiplatelet/anticoagulation therapy is administered to a patient;

c.        Properly train its employees/agents to recognize when a patient is hypercoagulable;

a.        Properly train its employees/agents to recognize when timely and appropriate dual antiplatelet/anticoagulation therapy has not been administered; and to make sure that dual antiplatelet/anticoagulation therapy is timely given; and

d.        Assuring that the hospitals in which its physicians perform procedures have the policies, procedures and guidelines identified in this Complaint.

123.    As a direct and proximate result of the negligence of Defendant RIA, Plaintiff Lauren Bern has suffered injuries, damages and losses as more fully described herein.

### THIRD CLAIM FOR RELIEF
### (Negligence – Defendant MIC)

124.    Plaintiffs incorporate by reference all paragraphs of this Complaint as if fully set forth herein.

125.    Defendant MIC is negligent for failing to have appropriate practices, policies and procedures, as well as training programs, to provide adequate direction to its employees, in evaluating and treating patients with intracranial aneurysms.

126.    With respect to their care and treatment of Plaintiff Lauren Bern, Defendant MIC breached its duty and was negligent by failing to:

a.        Have in place a policy or protocol requiring appropriate dual antiplatelet/anticoagulation therapy be administered to a patient prior to a

Cerebral Arteriogram with Endovascular Stent/Coil Reconstruction of
Intracranial Aneurysm procedure;

b.      Have in place a policy or protocol to ensure that a Cerebral Arteriogram
with Endovascular Stent/Coil Reconstruction of Intracranial Aneurysm procedure
is not performed before appropriate dual antiplatelet/anticoagulation therapy is
administered to a patient;

c.      Properly train its employees/agents to recognize when a patient is hyper
coagulable; and

d.      Properly train its employees/agents to recognize when timely and
appropriate dual antiplatelet/anticoagulation therapy has not been administered
and to make sure that dual antiplatelet/anticoagulation therapy is timely given.

127.    As a direct and proximate result of the negligence of Defendant MIC, Plaintiff
Lauren Bern has suffered injuries, damages and losses as more fully described herein.

### FOURTH CLAIM FOR RELIEF
#### (Respondeat Superior Liability – Defendant Swedish)

128.    Plaintiffs incorporate by reference all paragraphs of this Complaint as if fully set
forth herein.

129.    At all relevant times, nurses, technicians, and other healthcare providers of
Defendant Swedish, who were involved in the care and treatment of Plaintiff Lauren Bern on
February 12, 2021, were officers, agents, shareholders, employees, independent contractors
and/or partners of Defendant Swedish, acting within the course and scope of their employment
or within their authority as agents of Defendant Swedish.

130.    The nurses, technicians and other healthcare providers of Defendant Swedish participated in the care and treatment of Plaintiff Lauren Bern prior to, during, and after the stenting procedure on February 12, 2021.

131.    The nurses, technicians and other healthcare providers of Defendant Swedish were negligent in their care and treatment of Plaintiff Lauren Bern and, as a result, she suffered injuries, damages, and losses.

132.    With respect to the care and treatment of Plaintiff Lauren Bern, the nurses, technicians and other healthcare providers of Defendant Swedish had a duty to exercise that degree of care, skill, caution, diligence and foresight exercised and expected of nurses, technicians and health care providers in similar situations.

133.    The nurses, technicians and other healthcare providers of Defendant Swedish deviated from that standard of care and were negligent in the care and treatment of Plaintiff Lauren Bern on or about February 12, 2021, including but not limited to, the following:

a.    Recognize Plaintiff Lauren Bern's hypercoagulability;

b.    Timely and appropriately ensure that Plaintiff Lauren Bern received the appropriate dual antiplatelet/anticoagulation therapy prior to the use of a stent during the February 12, 2021, procedure; and

c.    Timely and appropriately ensure that Plaintiff Lauren Bern received the appropriate dual antiplatelet/anticoagulation therapy during the February 12, 2021, procedure.

134.    Defendant Swedish is responsible for the acts and omissions of its agents, employees, officers, directors, independent contractors, shareholders and/or partners including, but not limited to, its nurses, technicians and other healthcare providers acting within the course and scope of their employment and within their authority as agents of Defendant Swedish.

135.    As a direct and proximate result of the negligence of Defendant Swedish, Plaintiff Lauren Bern has suffered injuries, damages and losses as more fully described herein.

## FIFTH CLAIM FOR RELIEF
### (Respondeat Superior Liability – Defendant RIA)

136.    Plaintiffs incorporate by reference all paragraphs of this Complaint as if fully set forth herein.

137.    Defendant RIA is liable for the acts and omissions of its non-physician employees, including its physician-assistant staff.

138.    At all times relevant, Jacob Garza, Susann Preuss, as well as other non-physician providers, were employees, servants, and/or agents of Defendant RIA, acting within the course and scope of their employment and/or within their actual or apparent authority as agent.

139.    Standard of care required Jacob Garza, Susann Preuss and other employees to recognize Plaintiff Lauren Bern had an increased risk of coagulation due to her pregnancy. With respect to their care and treatment of Plaintiff Lauren Bern, Mr. Garza and Ms. Preuss breached their duty and were negligent by failing to:

a.    Recognize Plaintiff Lauren Bern's hypercoagulability;

b.    Timely and appropriately ensure that Plaintiff Lauren Bern received the appropriate dual antiplatelet/anticoagulation therapy prior to the use of a stent during the February 12, 2021, procedure; and

    c.      Timely and appropriately ensure that Plaintiff Lauren Bern received the appropriate dual antiplatelet/anticoagulation therapy during the February 12, 2021, procedure.

140.    As a direct and proximate result of the negligence of Defendant RIA, Plaintiff Lauren Bern has suffered injuries, damages and losses as more fully described herein.

### SIXTH CLAIM FOR RELIEF
**(Respondeat Superior Liability – Defendant MIC)**

141.    Plaintiffs incorporate by reference all paragraphs of this Complaint as if fully set forth herein.

142.    Defendant MIC is liable for the acts and omissions of its non-physician employees, including its physician-assistant staff.

143.    At all times relevant, Jacob Garza, Susann Preuss, as well as other non-physician providers, were employees, servants, and/or agents of Defendant MIC, acting within the course and scope of their employment and/or within their actual or apparent authority as agent.

144.    Standard of care required Jacob Garza, Susann Preuss and other employees to recognize Plaintiff Lauren Bern had an increased risk of coagulation due to her pregnancy.  With respect to their care and treatment of Plaintiff Lauren Bern, Mr. Garza and Ms. Preuss breached their duty and were negligent by failing to:

    a.      Recognize Plaintiff Lauren Bern's hypercoagulability;

    b.      Timely and appropriately ensure that Plaintiff Lauren Bern received the appropriate dual antiplatelet/anticoagulation therapy prior to the use of a stent during the February 12, 2021, procedure; and

    c.     Timely and appropriately ensure that Plaintiff Lauren Bern received the appropriate dual antiplatelet/anticoagulation therapy during the February 12, 2021, procedure.

145.    As a direct and proximate result of the negligence of Defendant MIC, Plaintiff Lauren Bern has suffered injuries, damages and losses as more fully described herein.

### SEVENTH CLAIM FOR RELIEF
#### (Negligence – Defendant Bellon)

146.    Plaintiffs hereby incorporate all other paragraphs in this Complaint as if fully set forth herein.

147.    Defendant Bellon was negligent in his care and treatment of Plaintiff Lauren Bern and that negligence includes, but is not limited to, one or more of the following:

    a.     Failure to promptly order appropriate dual antiplatelet/anticoagulation therapy prior to electing to perform the February 12, 2021, Neuroform stenting procedure;

    b.     When the decision was made to convert to a stenting procedure from a coiling procedure, failing to recognize Plaintiff Lauren Bern's pre-procedure hypercoagulability required timely and appropriate administration of dual antiplatelet/anticoagulation therapy; and

    c.     Failure to promptly order appropriate dual antiplatelet/anticoagulation therapy during and after the February 12, 2021, procedure.

148.    As a direct and proximate result of Defendant Bellon's negligence, Plaintiff Lauren Bern has suffered injuries, damages and losses as more fully described herein.

### EIGHTH CLAIM FOR RELIEF
#### (Loss of Consortium)

149.    Plaintiffs hereby incorporate all other paragraphs in this Complaint as if fully set forth herein.

150.    At all relevant times, Plaintiffs Lauren Bern a/k/a Lauren Britton and Joshua Britton were married and living together as husband and wife.

151.    As a direct and proximate result of the injuries suffered by Lauren Bern a/k/a Lauren Britton, Plaintiff Joshua Britton has suffered a loss of society, companionship, comfort, and consortium of his wife, as well as all other damages permitted by Colorado law.

WHEREFORE, Plaintiffs respectfully pray that a judgment be entered for compensatory damages in Plaintiffs' favor and against Defendants in an amount to be determined by the trier of fact, including compensation for the damages permitted by Colorado law, pre-judgment and post-judgment interest as allowed by law, all costs, including expert witness fees, filing fees, deposition expenses, attorneys' fees, and for such other and further relief as the Court may deem appropriate.

## PLAINTIFFS DEMAND A TRIAL TO A JURY

Respectfully submitted this 2nd day of February, 2023.


LEVENTHAL PUGA BRALEY P.C.


By: *s/ Jim Leventhal*
Jim Leventhal, #5815
Julia Thompson, #25897
Jed Greenblatt, #41122
Leventhal Puga Braley P.C.
950 South Cherry Street, Suite 600
Denver, CO 80246
(303) 795-9945
jim@leventhal-law.com
jthompson@leventhal-law.com
jgreenblatt@leventhal-law.com

24

**ATTORNEYS FOR PLAINTIFFS**

**Plaintiffs' Address:**
2052 Marston Ln
Flossmoor, IL 60422