**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 23-cv-00304-NYW-KAS

LAUREN BERN a/k/a LAUREN BRITTON, and
JOSHUA BRITTON,

      Plaintiffs,

v.

HCA-HEALTHONE LLC, d/b/a SWEDISH MEDICAL CENTER, and
RICHARD BELLON, MD,

      Defendants.

_____

**ORDER ON MOTIONS TO STRIKE DEFENDANTS' EXPERTS**
_____

This matter is before the Court on Plaintiffs' Motion to Strike Certain Opinions of Alison Wise, CPA ("Motion to Strike Ms. Wise"), [Doc. 116, filed August 13, 2025], and Plaintiffs' Motion to Strike Certain Opinions of Kara Flavin, M.D. ("Motion to Strike Dr. Flavin" and together, "Motions"), [Doc. 117, filed August 13, 2025].[1] Defendants filed joint Responses to both Motions, [Doc. 120; Doc. 121], and Plaintiffs replied, [Doc. 133; Doc. 134]. The Parties have not requested a hearing on the Motions, and upon review, the Court concludes that oral argument will not materially assist in their resolution. For the reasons set forth herein, Plaintiffs' Motion to Strike Ms. Wise is respectfully **GRANTED in**

_____

[1] Where the Court refers to the filings made in Electronic Case Files ("ECF") system in this action, it uses the convention [Doc. __] and uses the page number as assigned by the ECF system, except when citing from the transcript of a deposition. When citing the transcript of a deposition, the Court uses the ECF docket number but cites to the page and line numbers as assigned in the original transcript, for the purposes of consistency.

**part** and **DENIED in part**, and Plaintiffs' Motion to Strike Dr. Flavin is respectfully **GRANTED**.

## BACKGROUND

This is a medical malpractice action which arises from care provided by Defendant Richard Bellon, M.D. ("Dr. Bellon") to Plaintiff Lauren Bern a/k/a Lauren Britton ("Ms. Bern") in February 2021 at Defendant HCA-HealthONE LLC d/b/a Swedish Medical Center ("SMC").  *See generally* [Doc. 1].  On February 7, 2021, Ms. Bern was 38 years old and 40 weeks pregnant.  [*Id.* at ¶ 9].  She started experiencing a "thunderclap headache, which she described as the worst headache of her life," and was admitted via ambulance to a non-party hospital.  [*Id.* at ¶¶ 13–15].  A CT scan revealed Ms. Bern to have "a subarachnoid hemorrhage caused by an aneurysm," and Ms. Bern was transferred emergently to the intensive care unit at Swedish Medical Center.  [*Id.* at ¶¶ 18–26].  Once at SMC, Ms. Bern underwent a cerebral arteriogram performed by Dr. Bellon.  [*Id.* at ¶ 29].  After the procedure, Dr. Bellon reported that Ms. Bern had a "[t]hrombosed basilar trunk aneurysm."  [*Id.* at ¶¶ 30–35].  Later that day, a non-party doctor performed a cesarean section on Ms. Bern and delivered her baby.  [*Id.* at ¶¶ 36, 47].

On February 12, 2021, Dr. Bellon performed a "Cerebral Arteriogram with Endovascular Stent/Coil Reconstruction of Intracranial Aneurysm" on Ms. Bern.  [*Id.* at ¶ 51; Doc. 121 at 2].  This procedure is used "to treat a ruptured brain aneurysm by inserting a catheter into an artery and threading it up to the aneurysm," and subsequently "us[ing] a stent and/or coils to neutralize the aneurysm from inside the blood vessel itself." [Doc. 1 at ¶¶ 52–53].  During this procedure, Dr. Bellon was unable to fully coil the aneurysm and elected to use a stent to secure the coil in place.  [*Id.* at ¶¶ 61–77; Doc.

2

121 at 2]. Plaintiffs allege, among other things, that because Dr. Bellon did not administer Dual Antiplatelet Therapy ("DAPT") before, during, and/or after placement of the stent, Ms. Bern suffered a stroke following the procedure, resulting in injuries. [Doc. 1 at ¶¶ 80–82, 118–19, 133, 147–48].

This action followed. Plaintiffs are Ms. Bern and her husband, Joshua Britton ("Mr. Britton"). *See* [*id.* at ¶ 150]. They filed their Complaint on February 2, 2023, alleging claims for: (1) negligence against both Defendants, (2) respondeat superior against SMC, and (3) loss of consortium. [*Id.* at ¶¶ 116–119, 128–135, 146–151]. Plaintiffs allege that Ms. Bern's injuries include "permanent disfigurement and functional impairment; increased risk of future complications; past and future medical and rehabilitative care and treatment; 24/7 life care[;] past and future wage loss; need for assisted care and other economic damages[;] past and future pain, mental anguish, emotional distress, and psychological complications." [*Id.* at ¶ 119].

In support of their alleged damages, Plaintiffs disclosed several experts, including (1) an economist, Patricia Pacey, Ph.D. ("Dr. Pacey"); and (2) a physical medicine and rehabilitation doctor, Gary M. Yarkony, M.D. ("Dr. Yarkony"). [Doc. 143-1 at 7–8]. Defendants, in turn, disclosed rebuttal experts, including (1) a forensic accountant, Alison Wise, CPA ("Ms. Wise"), *see* [Doc. 120 at 1–2]; and (2) a physical medicine and rehabilitation doctor, Kara Flavin, M.D. ("Dr. Flavin"), *see* [Doc. 121 at 1]. Plaintiffs bring the present Motions to strike certain opinions of Ms. Wise and Dr. Flavin.

## LEGAL STANDARDS

Rule 702 of the Federal Rules of Evidence provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. As noted by the Advisory Committee when the Rule was first promulgated, "[a]n intelligent evaluation of facts is often difficult or impossible without the application of some scientific, technical, or other specialized knowledge." Fed. R. Evid. 702 advisory committee's note.

It is well established that trial courts are charged with the responsibility of acting as gatekeepers to ensure that expert testimony or evidence admitted is not only relevant, but also reliable. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–52 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588–89 (1993). To fulfill that gatekeeper function, courts within the Tenth Circuit conduct a two-part inquiry. First, courts consider whether the expert's proffered testimony has a reliable basis in the knowledge and experience of his or her discipline by assessing the expert's qualifications and the admissibility of the proffered evidence, i.e., whether the reasoning or methodology underlying the testimony is reliable. *Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1082 (D. Colo. 2006) (citing *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232–33 (10th Cir. 2005)). And "the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability

4

determination." *Kumho Tire*, 526 U.S. at 142.  Second, courts look at whether the proposed testimony is sufficiently relevant to the issues presented to the factfinder.  *See id.*  The party offering the expert opinion bears the burden of establishing its admissibility, including all foundational requirements, by a preponderance of the evidence.  *United States v. Nacchio*, 555 F.3d 1234, 1251 (10th Cir. 2009) (en banc); *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1220 (D. Colo. 2008).

"Generally, the district court should focus on an expert's methodology rather than the conclusions it generates."  *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003).  To that end, courts consider the following non-exhaustive factors in analyzing whether a particular expert opinion meets the requirements of Rule 702, *Daubert*, and their progeny:

> (1) whether the opinion at issue is susceptible to testing and has been subjected to such testing; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology used and whether there are standards controlling the technique's operation; and (4) whether the theory has been accepted in the scientific community.

*Id.*  The analysis is opinion-centric, rather than expert-centric.  *See Crabbe*, 608 F. Supp. 2d at 1221.  This standard controls the Court's consideration of Plaintiffs' Motions.

## ANALYSIS

## I.      Motion to Strike Ms. Wise

Defendants retained Ms. Wise "to perform a forensic evaluation of Plaintiffs' claimed financial damages and to counter the opinions of Plaintiffs' retained economist expert."  [Doc. 120 at 1–2]; *see also* [Doc. 116 at 1–2].  Plaintiffs move to strike and preclude three of Ms. Wise's categories of opinions regarding Ms. Bern's:  (1) salary and

benefits; (2) future wage loss; and (3) needed household services.  [Doc. 116 at 2–3].

Plaintiffs further to seek to exclude any testimony from Ms. Wise on Ms. Bern's current

medical condition or medical needs.  [*Id.*].

Defendants' Response is less than five pages long, recites general *Daubert*

principles, and vaguely asserts that all of Plaintiffs' concerns go to weight rather than

reliability.  *See generally* [Doc. 120].  But despite where the burden rests, it does not

engage substantively with any of the specific challenges that Plaintiffs raise.  *See* [*id.*].

### A.    Opinions on Ms. Bern's Salary and Benefits

Ms. Wise opined about Ms. Bern's past and future lost earnings and benefits based

on Ms. Bern's employment at the time of the incident. *See* [Doc. 116-4 at ¶¶ 20–37, 54].

As part of that opinion, Ms. Wise calculated Ms. Bern's lost past and future benefits.  [*Id.*

at ¶¶ 26–29, 35–36, 54].  Ms. Wise opined that because there has been "[n]o evidence

or testimony . . . to support which benefits [Ms. Bern] was actually participating in," the

fringe benefit percentage should be 11.3% of her salary, "which approximates the amount

of Ms. Bern's salary allocable to legally required benefits."  [*Id.* at ¶¶ 28–29].

Plaintiffs contend that this opinion should be stricken because "Ms. Wise did not

consider Ms. Bern's specific benefits provided through her employer" and the 11.3% rate

"only included calculations for Social Security and Medicare."  [Doc. 116 at 6 (citing [Doc.

116-1 at 35:6–37:5])].  Indeed, when asked at her deposition, Ms. Wise admitted that if

Ms. Bern participated in other benefits, such as health insurance, a 401(k) plan with a

match, and disability, the fringe benefits would increase by 13–15%.  [*Id.* at 6–7 (citing

[Doc. 116-1 at 35:6–36:25, 39:9–24])].  Ms. Wise stated that she did not include those

benefits in her calculation because she was "not offered evidence to support Ms. Bern's

participation in additional benefits through her employer" and she did not ask Defendants' counsel to find out if there was such evidence. [Doc. 116-1 at 35:6–20]. However, Mr. Britton testified in his deposition that Ms. Bern received health insurance, a 401(k) plan, and stock options as benefits from her employer. [Doc. 6 at 7; Doc. 116-1 at 54:20–56:12]. Ms. Wise testified that she did not receive Mr. Britton's deposition testimony and "if [his testimony] is correct," she agrees that "there is evidence in the record that [Ms. Bern] has additional . . . employer benefits that [Ms. Wise] did not consider in the fringe benefit analysis." [Doc. 116-1 at 56:13–22]. Plaintiffs do not dispute that "Ms. Wise's methodology employed for the calculation itself may be acceptable under *Daubert*," but maintain that her failure to take into account all the benefits that Ms. Bern was receiving "distorted the entire analysis." [Doc. 116 at 8]. They argue that because the fringe benefits analysis is based on insufficient data, the "overall lost wage calculation" is erroneous. [*Id.*].

While in some cases the Plaintiffs' concession that the methodology may be acceptable under *Daubert* would be sufficient to deny the Motion, here, the record reveals that Ms. Wise—for unexplained and unknown reasons—simply abandoned a methodology altogether in favor of an unsupported assumption regarding fringe benefits. Defendants do not dispute Ms. Wise's testimony that she was able to obtain every document that she requested from counsel in this litigation, *see* [Doc. 116-1 at 13:3–6], nor do they dispute that they failed to provide Ms. Wise with Mr. Britton's deposition transcript or any information about the benefits that Ms. Bern received from her employer, *see generally* [Doc. 120]. Defendants also do not dispute that this information is necessary for an analysis regarding lost wages and that, without it, Ms. Wise's opinion is

premised on insufficient data.  [*Id.*].  Nor do Defendants identify any generally accepted methodology that permits calculating fringe benefits without considering the employee's actual benefit package.  *See Crabbe*, 556 F. Supp. 2d at 1223 (the "sufficient facts and data" inquiry examines "whether the witness obtained the amount of data that the methodology itself demands").

At most, Defendants argue that "Ms. Wise provided multiple references to scientific literature that support her methodology and opinions," but Defendants point to the entirety of Ms. Wise's Report as support for that sentence.  [Doc. 120 at 4].  This is plainly insufficient to meet Defendants' burden.  *See Nacchio*, 555 F.3d at 1251; *see also Chimney Rock Pub. Power Dist. v. Tri-State Generation & Transmission Ass'n*, No. 10-cv-02349-WJM-KMT, 2014 WL 1715096, at *6 (D. Colo. Apr. 30, 2014) (ruling that the defendant failed to meet its burden to establish the admissibility of expert opinion where its "[r]esponse fail[ed] to identify support in [the expert]'s report for each of the[] statements" at issue).  Instead, it appears that Ms. Wise knew of the appropriate methodology to use but inexplicably failed to ask for any of the underlying data that would allow her to employ such methodology.

Defendants also argue, in a conclusory manner, that excluding Ms. Wise's opinions, including this one, would be "highly prejudicial to Defendants, who are entitled to present evidence to the jury to counter the opinions of Plaintiffs' retained financial expert."  [Doc. 120 at 2–3].  The Court respectfully disagrees that such argument carries Defendants' burden or alters the analysis.  Any prejudice to Defendants lies squarely with Defendants and Ms. Wise for eschewing the appropriate methodology by ignoring relevant data that was available to them.  Defendants are not entitled to present an expert

opinion that, as here, they have not established is "based on sufficient facts or data" and is "the product of reliable principles and methods."  Fed. R. Evid. 702.

Accordingly, the Court respectfully **GRANTS** Plaintiffs' motion to strike Ms. Wise's opinions regarding Ms. Bern's benefit loss and any opinions derived from that figure.

### B.     Opinions on Ms. Bern's Future Wage Loss

Ms. Wise also opines in her report regarding Ms. Bern's future wage loss, and Plaintiffs raise three distinct challenges to that opinion:  first, they argue that Ms. Wise's admission that there is a calculation error in her report "provides adequate evidence that calls the totality of Ms. Wise's opinions in question."  [Doc. 116 at 9].  Second, they contend that Ms. Wise's reliance on the "Markov Model" to calculate Ms. Bern's work-life expectancy is unreliable, because "she has not researched the model to see any validation or verification of the data," is "unaware of the data the Markov Model uses to generate their reports," and cannot "explain the statistical analysis underlying the data." [*Id.* at 9–10].  Third, Plaintiffs argue that Ms. Wise's reduction of Ms. Bern's future wage loss based on Dr. Flavin's life expectancy opinion has no grounding in any generally accepted forensic accounting methodology and additionally should be precluded because Dr. Flavin's life expectancy opinion should be excluded.  [*Id.* at 10–11].  Defendants do not respond to any of these arguments in any meaningful way.  *See generally* [Doc. 120].

The Court is respectfully not persuaded by Plaintiffs' first two arguments—for which Plaintiffs cite no authority in support.  At threshold, a "simple math error" in an expert's calculation, [Doc. 116 at 9], is not grounds to strike an expert opinion that is otherwise based on sound methodology.  *See, e.g.*, *In re Blair*, 588 B.R. 605, 625 n.12 (Bankr. D. Colo. 2018) ("[T]he Court does not consider mathematical errors or the like as a basis for

9

exclusion of expert testimony under Fed. R. Evid. 702 and *Daubert*. . . . Errors and conclusions are more appropriately addressed in cross-examination if the proposed expert testimony passes muster under Fed. R. Evid. 702."); *Pursell v. Hydrochem LLC*, No. 3:20-cv-01188-MAB, 2022 WL 13694617, at *3 (S.D. Ill. Oct. 21, 2022) ("A challenge to an expert's 'miscalculation' or mathematical error goes to weight of the evidence, not admissibility."); *U.S. Bank Nat'l Ass'n v. James*, 741 F. Supp. 2d 337, 340 (D. Me. 2010) ("[M]athematical errors of this sort are not grounds for excluding an expert opinion. . . . If [the expert] hews to these figures in trial testimony, any mistakes that the plaintiff can demonstrate go to the weight to be given that testimony, not to its admissibility."); *see also, e.g.*, *Deputy v. Lehman Bros.*, 345 F.3d 494, 506 (7th Cir. 2003) ("A typographical error appearing in an expert report might lead a fact-finder to conclude that the expert is sloppy, but it does not render an expert's opinion unreliable and thus inadmissible."). Instead, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence," *Daubert*, 509 U.S. at 596, such as reports with mathematical errors.

Regarding the Markov Model, Plaintiffs do not argue that the model itself is unreliable. Indeed, Plaintiffs acknowledge that Ms. Wise testified that she has been using the Markov Model throughout her entire career as a forensic accountant, as has her supervisor. [Doc. 116 at 9 (citing [Doc. 116-1 at 89:10–15; Doc. 116-6 at 42:18–23])]. And Plaintiffs cite to an article in the Journal of Forensic Economics which has described the Markov Model as "the current paradigm employed by forensic economists to calculate mortality-adjusted time in-and-out of the labor force." [Doc. 116-5 at 2].

Rather than take issue with the economic model's reliability, Plaintiffs attack Ms. Wise's usage of the model on the grounds that, essentially, she does not understand how it works and has not independently verified the data it uses.  [Doc. 116 at 9–10].  But these issues go to the weight of the evidence and can be addressed through cross-examination.  *See, e.g.*, *Burlington N. & Santa Fe Ry. Co. v. Garcia*, No. 98-cv-00740-MV-RLP, 2000 WL 36740057, at *4 (D.N.M. Jan. 7, 2000) (an expert "need not possess his own independent understanding of the computer models in order to testify as an expert, provided that a proper foundation is laid that others in the field would also likewise rely on them"); *Schmidt v. Conagra Foods, Inc.*, No. 14-cv-01816-SRU, 2020 WL 7027445, at *25 (D. Conn. Nov. 30, 2020) (an expert "need not be an expert with respect to a specific mathematical model in order to rely on that model in her report"); *United States v. Morgan*, 292 F. Supp. 3d 475, 485 (D.D.C. 2018) ("[T]his Court does not require an expert to have an in-depth knowledge of all the algorithms underlying their technological tools . . . to reliably testify about the outputs of those tools.").  Plaintiffs do not cite any authority to the contrary.

Thus, the Court respectfully **DECLINES** to exclude Ms. Wise's opinions of Ms. Bern's work-life expectancy based on the Markov Model.  However, as explained below, the Court agrees with Plaintiffs that Dr. Flavin's life expectancy calculation should be excluded.  *See infra* Section II.  Accordingly, the Court respectfully **GRANTS** Plaintiffs' motion to exclude Ms. Wise's opinion regarding Ms. Bern's future wage loss to the extent it relies on Dr. Flavin's life expectancy calculation.

### C.    Opinions on Ms. Bern's Needed Household Services

In her expert report, Dr. Pacey included a section regarding the cost of "replacement of certain services that Ms. Bern would provide to her family[,] . . . such as mowing the lawn, housekeeping, or grocery shopping."  *See* [Doc. 116-4 at ¶ 38].  Ms. Wise opined in her report that the inclusion of this calculation "creates an overstatement of damages," because it "overlap[s]" with the costs already included "in the Life Care plans provided by both Plaintiff and Defense experts."  [*Id.* at ¶¶ 42–43].  That is, because Ms. Bern's "life care plan accommodates for assistance with her personal care on a 24-hour basis," Ms. Wise's opinion is that any household services will necessarily be covered by those same aides, rendering the separate household services line item duplicative.  [*Id.*].  Ms. Wise concluded that the total cost for "essential / home services" expenses is $0.  [*Id.* at ¶ 43].

Plaintiffs urge the Court to strike this opinion because "Ms. Wise did not complete any evaluation of Ms. Bern's necessary household services and did not employ any analysis to review the household service loss for Ms. Bern."  [Doc. 116 at 11].  Further, Plaintiffs argue that Ms. Wise admitted she was speculating that these household replacement costs would be covered by the costs in the Life Care plans.  [*Id.* (quoting [Doc. 116-1 at 78:14–79:20])].

Defendants do not address Plaintiffs' arguments at all, beyond the general statements that Ms. Wise's opinions are reliable and relevant.  *See* [Doc. 120; Doc. 133 at 3].  Without the benefit of a response from Defendants, the Court respectfully agrees with Plaintiffs.  Ms. Wise admitted in her deposition that she did not conduct any investigation into whether home healthcare agencies—i.e. what Ms. Bern's life care plan

12

accommodates for—provide household services such as mowing the lawn, housekeeping, and grocery shopping. [Doc. 116-1 at 78:19–79:15]. Nor is there any evidence that Ms. Wise relied on her expertise to come to this conclusion, either in her report or her deposition. On the contrary, Ms. Wise admitted that she was "speculating that the home healthcare agencies would actually provide the essential/home services." [*Id.* at 79:16–20]. Indeed, Ms. Wise even conceded in her deposition that she "do[es]n't know enough as to whether or not there's an overlap [between the Life Plan and essential household services], so [she] won't be critical of Dr. Pacey for including that in her analysis." [*Id.* at 81:8–13]. Thus, this opinion does not "meet the strictures of Rule 702." *See Gianfrancisco v. Excelsior Youth Ctrs., Inc.*, No. 10-cv-00991-PAB-KMT, 2012 WL 2890916, at *5 (D. Colo. July 16, 2012) ("Without facts, data, or methodology, the Court finds that these opinions do not meet the strictures of Rule 702."); *see also Mitchell v. Gencorp Inc.*, 165 F.3d 778, 780 (10th Cir. 1999) (expert testimony "must be based on actual knowledge and not 'subjective belief or unsupported speculation'" (quoting *Daubert*, 509 U.S. at 590)).

The Court respectfully **GRANTS** Plaintiffs' Motion to Strike Ms. Wise's opinions regarding Ms. Bern's necessary household services.

### D. Testimony Regarding Ms. Bern's Current Medical Condition or Medical Needs

Plaintiffs include one sentence in the introduction of their Motion to Strike Ms. Wise requesting that the Court "exclude any testimony from Ms. Wise on Ms. Bern's current medical condition or medical needs, as Ms. Wise is admittedly not qualified to offer medical, mental health, or other healthcare opinions." *See* [Doc. 116 at 3]. Plaintiffs do not provide any additional information and do not point the Court to any portions of Ms.

Wise's report or deposition where Ms. Wise opined on "Ms. Bern's current medical condition or medical needs." To the extent that Plaintiffs are concerned about Ms. Wise testifying about matters not included in her report, this issue is not properly before the Court and can be addressed if it arises during trial. *See Palmer v. Asarco Inc.*, No. 03-cv-00498-CVE-PJC, 2007 WL 2298422, at *5 (N.D. Okla. Aug. 6, 2007) ("Rule 26 is clear that an expert's complete opinions and basis for those opinions must be disclosed in [her] report, and the Court will consider only opinions and data identified in [the expert's] report when ruling on the reliability of [her] testimony.").

Accordingly, the Court **DENIES** the portion of Plaintiffs' Motion to Strike Ms. Wise regarding excluding Ms. Wise's testimony on Ms. Bern's current medical condition or medical needs.

## II.     Motion to Strike Dr. Flavin

Dr. Flavin was retained by Defendants to "conduct[] an independent medical examination of [Ms. Bern] . . . and opine[] on her future needs." [Doc. 121 at 3]. In her report, Dr. Flavin offered a range of opinions regarding Ms. Bern's medical care needs, including, as relevant to the instant Motion, that Ms. Bern has a life expectancy of 18 years from the date of the report. [Doc. 121-2 at 9]. Dr. Flavin based her opinion about life expectancy on an article called "Life Expectancy after Stroke Based on Age, Sex, and Rankin Grade of Disability: A Synthesis" (the "Shavelle Study"). [*Id.*]. The Shavelle Study is the first study to "report[] life expectancies stratified by the 2 most important factors: age and severity of disability." [Doc. 121-3 at 2]. It is a synthesis study that combined the work of "11 long-term follow-up studies of stroke patients that reported the multivariate effects of age, sex, the modified Rankin Scale (mRS) grade of disability, among other

14

factors"; computed mortality rates; and "used the rates the construct life tables, and hence obtain life expectancies." [*Id.* at 1–2; Doc. 121 at 3]. As relevant here, the Shavelle Study constructed the following life expectancy table:

**Table 2.** *Life expectancy (years) by age, sex, and grade on the modified Rankin Scale*

| Age* | | Modified Rankin Scale Grade | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Male | GP | 0 | 1 | 2 | 3 | 4 | 5 | PVS |
| 50 | 30 | 28 | 27 | 22 | 17 | 13 | 9 | 7 |
| 60 | 22 | 20 | 19 | 16 | 13 | 9 | 7 | 5 |
| 70 | 14 | 13 | 13 | 11 | 8 | 6 | 5 | 3 |
| 80 | 8 | 7 | 7 | 6 | 5 | 4 | 3 | 2 |
| Female | | | | | | | | |
| 50 | 33 | 32 | 30 | 25 | 19 | 14 | 9 | 7 |
| 60 | 25 | 24 | 22 | 18 | 14 | 10 | 7 | 6 |
| 70 | 17 | 16 | 15 | 12 | 9 | 7 | 5 | 4 |
| 80 | 10 | 9 | 9 | 7 | 6 | 4 | 3 | 3 |

Abbreviations: GP, General population life expectancies.[25] PVS = Persistent vegetative state; values taken or derived from Shavelle et al.[26]

Grade Description:
0: No symptoms or disabilities due to stroke.
1: No significant disability following stroke, despite symptoms: Able to carry out all usual duties and activities.
2: Slight disability: Unable to carry out all previous activities but able to look after own affairs without assistance.
3: Moderate disability: Requiring some help with daily activities, but is able to walk without assistance.
4: Moderately severe disability: Unable to walk without assistance, and unable to attend to own bodily needs.
5: Severe disability: Bedridden, incontinent, and requires constant nursing care and attention.
*Age = Age at follow-up, rather than at stroke onset.

[Doc. 121-3 at 3]. The Shavelle Study caveated that its results "are applicable to a given person who is of the stated age and sex, and whose clinical condition is 'typical' of the state Rankin grade." [*Id.* at 5].

Plaintiffs argue that Dr. Flavin's opinion regarding Ms. Bern's life expectancy should be stricken for four reasons: (1) it is not grounded in the method of science, and is therefore unreliable, [Doc. 117 at 3–4]; (2) Dr. Flavin is not a statistician and does not have the education, training, or experience to conduct the statistical extrapolation needed for her life expectancy opinion, [*id.* at 4–5]; (3) the method used by Dr. Flavin to extrapolate Ms. Bern's life expectancy is not grounded in accepted scientific principles,

15

[*id.* at 5–11]; and (4) the study that Dr. Flavin used for her calculations is not meant to estimate the life expectancy of a person who suffers a stroke, [*id.* at 11–13].

The Court finds the third reason dispositive and therefore will limit its analysis to whether the method used by Dr. Flavin to extrapolate Ms. Bern's life expectancy is grounded in accepted scientific principles. The Shavelle Study's life expectancy table only begins at 50 years old at the time of "follow-up."[2] [Doc. 121-3 at 3]. Meanwhile, Ms. Bern was 42 years old when Dr. Flavin observed her. [Doc. 117 at 8]. Dr. Flavin acknowledged as much in her deposition and explained that given that "Ms. Bern is younger than the identified ages," Dr. Flavin had to "extrapolate[]" to apply the Shavelle Study to Ms. Bern. [Doc. 117-1 at 110:11–14, 116:5–20]. When asked about what methodology she used in the extrapolation, Dr. Flavin testified that she first assigned Ms. Bern an mRS grade of 4 and then observed the differences between life expectancies for each successive decade in the Shavelle Study. [*Id.* at 117:9–118:1, 119:21–120:6]. Dr. Flavin noticed "the trend that is shown for people as they get older," i.e., that "between each decade of life for a Modified Rankin Scale of four," there are three or four years of decreased life expectancy. [*Id.* at 119:25–120:6]. Based on this trend, Dr. Flavin "extrapolated four years in the other direction"—that is, where the Shavelle Study estimates life expectancy at 14 years for a 50-year-old woman with an mRS grade of 4, Dr. Flavin added 4 years to arrive at a life expectancy of 18 years for Ms. Bern, a 42-year-old woman who Dr. Flavin assessed to have an mRS grade of 4. *See* [*id.*].

---

[2] Plaintiffs point out that in the 11 studies that the Shavelle Study synthesized, the youngest age examined "within the standard deviation of any study is 52 years old." [Doc. 117 at 8, 10]. While this may be correct, the Shavelle Study computed life expectancies starting at age 50. The Court will not delve into the Shavelle Study's analysis and will treat the youngest represented age as 50 years old at the time of observation.

Plaintiffs argue that the method that Dr. Flavin used to extrapolate Ms. Bern's life expectancy was unreliable, *see* [Doc. 117 at 6–10], pointing to Dr. Flavin's deposition testimony admitting that Dr. Flavin "did not know if the method she used to extrapolate . . . was generally accepted by statisticians," [*id.* at 6 (citing [Doc. 117-1 at 116:10–14])]; *see also* [Doc. 117-1 at 120:12–15 (responding "That is true.  I'm not a statistician." to the question, "And you don't know whether or not from a statistician standpoint the way you extrapolated is a generally accepted methodology, true?")].

Defendants respond that "Dr. Flavin's extrapolation is the reliable result of ordinary mathematics and based on her own clinical experience as a clinician."  [Doc. 121 at 9]; *see also* [*id.* at 10 (arguing that "[t]he natural difference between the life expectancy at 40 and 50 years old, based on the trend of the other listed life expectancies, would be 4 years")].  They contend that "[t]he reality of determining [Ms. Bern's] life expectancy is that it is a primarily experience-based experience, as opposed to one that is rooted entirely in science," [*id.* at 11], and Dr. Flavin, "with her decades of experience working with stroke victims throughout their remaining lives, is uniquely qualified to opine on how long a patient like [Ms. Bern] is expected to live," [*id.* at 12].  They conclude that Plaintiffs' criticisms go to the weight of Dr. Flavin's opinion and should be for the jury to decide. [*Id.*].[3]

---

[3] Defendants contend that criticisms of Dr. Flavin's extrapolation go to weight "especially in light of the deficiencies of Plaintiffs' own expert's opinion."  [Doc. 121 at 12]; *see also* [*id.* at 11 (criticizing Plaintiffs' expert's opinion regarding Ms. Bern's life expectancy)]. Defendants cite no authority for why the Court should consider Defendants' criticism of the opinions of another expert—which are not being challenged—in deciding whether Dr. Flavin's methodology is reliable.

17

The Court respectfully finds Dr. Flavin's extrapolation methodology unreliable under Rule 702.  It is well-settled that "'[t]rained experts commonly extrapolate from existing data.'" *Murphy-Sims v. Owners Ins. Co.*, No. 16-cv-00759-CMA-MLC, 2018 WL 8838811, at *6 (D. Colo. Feb. 27, 2018) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 147 (1997)).  "'But nothing in either *Daubert* or the Federal Rules of Evidence [r]equires a district court to admit opinion evidence that is connected to existing data only be the *ipse dixit* of the expert.'" *Id.* (quoting *Gen. Elec.*, 522 U.S. at 147); *see also Hughes v. Kia Motors Corp.*, No. 11-cv-02733-JOF, 2013 WL 12099352, at *7 (N.D. Ga. Jan. 29, 2013) (finding an expert's opinion inadmissible where expert combined his review of the investigation and medical documents "with his experience as a forensic pathologist and participation in innumerous accident investigations"), *aff'd*, 766 F.3d 1317 (11th Cir. 2014).  The Court must be assured that the expert is employing "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152; *Robinson Farms, Inc. v. ADM All. Nutrition, Inc.*, No. 05-cv-04089-KGS, 2007 WL 2875132, at *4 (D. Kan. Sept. 29, 2007).

To be sure, courts find that "studies involving similar but not identical situations may be helpful," but in such cases, experts "must set forth the steps used to reach the conclusion that the research is applicable." *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 606 (9th Cir. 2002).  And the reasoning between those steps "must be based on objective, verifiable evidence and scientific methodology of the kind traditionally used by experts in the field." *Id.* at 607.  Otherwise, "[a] court may conclude there is simply too great an analytical gap between data and the opinion proffered" and the expert must be excluded. *Murphy-Sims*, 2018 WL 8838811, at *6 (quoting *Gen. Elec.*, 522 U.S. at 147);

18

*see In re Viagra (Sildenafil Citrate) & Cialis (Tadalafil) Prods. Liab. Litig.*, 424 F. Supp. 3d 781, 790 (N.D. Cal. 2020) ("In short, both unsound methods and unjustified extrapolations from existing data can require exclusion of an expert's testimony.").

Here, Dr. Flavin acknowledged during her deposition that she does not know whether her extrapolation method is generally accepted. [Doc. 117-1 at 116:10–14]. She did not offer any supporting scientific literature or precedent, any accepted practice of extending survival data to younger cohorts, or any explanation for why extending a certain pattern observed across three age intervals would hold true for a patient a decade younger than anyone studied. And neither did Defendants in their Response; they point to no other court that has accepted this extrapolation method or any other expert who has even offered it. *See* [Doc. 121]. This is "a clear . . . example of *ipse dixit*." *Murphy-Sims*, 2018 WL 8838811, at *6 (striking expert's testimony where expert "d[id] not offer any accepted methodology" for his determination, leaving the court "with a circumstance where the expert says he is to be believed because he is the expert"); *see Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) (even if an expert is the "world's leading student" on an issue, "if he could or would not explain how his conclusions met the Rule's requirements, he was not entitled to give expert testimony"). In contrast, when courts allow this type of extrapolation—for instance, when experts extrapolate a study about women to a man, about adults to a child, or about animals to a human—it is because the experts explain the commonplace practice of the extrapolation, describe why the extrapolation is necessary, reference their experience and research, and/or cite supporting studies. *See, e.g., In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 289

19

F. Supp. 2d 1230, 1244–46 (W.D. Wash. 2003); *In re Bard Implanted Port Catheter Prods. Liab. Litig.*, No. MDL 3081, 2026 WL 622643, at *13 (D. Ariz. Mar. 5, 2026).

Defendants argue that Dr. Flavin's opinion should not be stricken because her extrapolation amounts to "ordinary mathematics" and because she brings "decades of experience working with stroke victims" to her analysis. [Doc. 121 at 9, 12]. Respectfully, neither argument persuades the Court. First, while the math (subtracting or adding 4) may be simple, the underlying assumption—that the observed decrease in life expectancy per decade remains constant as one extends the curve into an age cohort the study never examined—has no identified scientific foundation. *See Pappas v. Sony Elecs., Inc.*, 136 F. Supp. 2d 413, 423 (W.D. Pa. 2000) (excluding expert's testimony, reasoning in part that "although [the expert]'s chain of reasoning appeals to the common sense of a layman, he introduced no evidence to show that his method was a reliable one"); *see also Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 279 (5th Cir. 1998) ("Several post-*Daubert* cases have cautioned about leaping from an accepted scientific premise to an unsupported one. To support a conclusion based on such reasoning, the extrapolation or leap . . . must be reasonable and scientifically valid." (citations omitted)); [Doc. 134 at 5–6]. Especially considering that human aging is a non-linear process, this method of extrapolation requires more support than a reference to "ordinary mathematics" to be reliable.

Second, Defendants provide no support for their assertion that life expectancy is an "experience-based" field in which Dr. Flavin's "clinical experience as a clinician" can substitute for a validated methodology. *See* [Doc. 121 at 9, 12]. Moreover, Defendants do not point the Court to any evidence that Dr. Flavin relied on her experience in opining on Ms. Bern's life expectancy. And even if they did, Dr. Flavin would have had to "explain

how [her] experience leads to the conclusion reached and how that experience is reliably applied to the facts," *Piepes v. NAI Ent. Holdings LLC*, 394 F. Supp. 3d 315, 318 (E.D.N.Y. 2019) (quotation omitted); *see RVC Floor Decor, Ltd. v. Floor & Decor Outlets of Am., Inc.*, No. 18-cv-06449-JS-ARL, 2023 WL 2838423, at *8 (E.D.N.Y. Apr. 7, 2023) (finding that an expert's "lack of methodology or explanation as to how his experience informed his opinions [was] fatal to the admissibility of his report"); *Zenith Elecs.*, 395 F.3d at 419 ("A witness who invokes 'my expertise' rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines that term."), which she did not do here.

Thus, the Court finds that Defendants failed to establish that a reliable methodology was used in arriving at Dr. Flavin's life expectancy figure and **GRANTS** Plaintiffs' Motion to Strike this opinion.

## CONCLUSION

For the reasons set forth herein, **IT IS ORDERED** that:

(1)    Plaintiffs' Motion to Strike Certain Opinions of Alison Wise, CPA [Doc. 116] is **GRANTED in part** and **DENIED in part**; and

(2)    Plaintiffs' Motion to Strike Certain Opinions of Kara Flavin, M.D. [Doc. 117] is **GRANTED**.

DATED:  March 24, 2026                    BY THE COURT:

_____
Nina Y. Wang
United States District Judge

21